**BANNUM, INC. and Bannum Properties, Inc., Plaintiffs,**

v.

**CITY OF FORT LAUDERDALE et al., Defendants.**

No. 86–6926–CIV.

United States District Court, S.D. Florida, Miami Division.

April 11, 1997.

Scott T. Wendelsdorf, Ogden, Newell & Welch, Louisville, KY, Frank Amigo, Plantation, FL, for plaintiffs.

Robert H. Schwartz, Gunther & Whitaker, P.A., Fort Lauderdale, FL, for defendant.

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon (1) Defendant City of Fort Lauderdale's Mo-

tion for Final Summary Judgment (DE # 126); and (2) Plaintiff's Cross-motion for Summary Judgment (DE # 131).

THE COURT has considered the Motions, responses, and the pertinent portions of the record. Being otherwise fully advised in the premises, the Court enters the following order.

## BACKGROUND

### I. Procedural Background

Plaintiffs Bannum, Inc. and Bannum Properties, Inc. (collectively, "Bannum") commenced this action in 1986 against Defendants City of Fort Lauderdale (the "City") and various city administrative boards and officials pursuant to 42 U.S.C. § 1983. Defendants filed a motion for summary judgment arguing that they were entitled to absolute, qualified and municipal immunity, and the Court granted Defendants' motion for summary judgment. On appeal, the Court of Appeals for the Eleventh Circuit affirmed the Court's order granting summary judgment as to the administrative board and officials but vacated the Court's order as to the City. *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989 (11th Cir.1990). The City, therefore, is the sole remaining defendant. The City and Bannum respectively have filed the instant motions for summary judgment on Bannum's equal protection and due process claims.

### II. Undisputed Facts

The facts giving rise to this case began in 1985. The Bannum plaintiffs are Kentucky corporations and provide supervised residential programs for ex-offenders in conjunction with the United States Bureau of Prisons. On January 11, 1985, Bannum entered into a contract with the United States Department of Justice, Bureau of Prisons ("BOP") for the establishment of a community treatment center ("CTC") in Fort Lauderdale, Florida; the BOP subsequently awarded Bannum a three-year contract.[1] The CTC was to provide

housing and job placement services for federal prisoners serving the last stages of their sentences. The prisoners generally had been convicted of non-violent white collar crimes. Bannum intended to lease rooms at the Areca Palms Motel ("Areca Palms") in Fort Lauderdale to house its participants. Around that time, Bannum sought approval from the City for its CTC and filed an application for an occupational use license. Bannum did not apply for a special use license. In April 1985, the City approved Bannum's application for an occupational license on the condition that Bannum move its offices to a commercial zone and obtain a license for that office. Bannum moved its offices to 1776 E. Sunrise Boulevard, Fort Lauderdale, and the City issued to Bannum city and county occupational licenses for "housing and job placement services." As stated above, Bannum did not apply for a special use license and, therefore, the City did not issue said license. Bannum then commenced operation of its CTC.

Upon receiving complaints from City residents, the City issued a notice of violation of Section 47–11.1.1(d) of the Fort Lauderdale Code of Ordinance to the owner of the Areca Palms Motel, Gordon Johnson ("Johnson") on December 19, 1985. That section of the Fort Lauderdale Code of Ordinances requires a special use permit for the operation of a "custodial facility" in the City. Johnson then issued a notice to quit and vacate the premises to Bannum and also appealed the citation to the Board of Adjustments. At the Board of Adjustment meeting on February 12, 1986, Johnson, through his counsel, argued that Bannum's CTC did not constitute a "custodial facility." Lodie Leslie, Bannum's program manager in Fort Lauderdale, also testified at the hearing that Bannum did not have custody of the prisoners and argued that the CTC was not a custodial facility. The Board of Adjustment, however, denied the appeal and found that the Areca Palms Motel was being operated as a "custodial facility" as contemplated under Section 47–11.1.1(d). Johnson then appealed the Board of Adjustment's

---

1. The contract required Bannum to "conform to all applicable zoning ordinances, laws and codes; and local building, sanitation, health and fire codes and provide documentation confirming

adherence to local laws, ordinances and codes, where applicable or shall document non-applicability."

decision to the Fort Lauderdale Code Enforcement Board. At the meeting on February 25, 1986, Johnson and the Fort Lauderdale Code Enforcement Board entered into a stipulation agreeing that Johnson would appeal the Board of Adjustment's decision to the Circuit Court of Broward County.

On March 6, 1986, the BOP decided to remove the ex-offenders from the Areca Palms. On March 17, 1986, the BOP issued a Notice to Cure to Bannum and gave Bannum ten (10) days in which to cure the default, *i.e.,* Bannum's failure to procure a special use license. At that point, Bannum attempted to secure an alternate site for its program.

During the next seven months, Bannum worked with the City to find a new location for the CTC. Bannum located a suitable property at 400 Southeast 31st Street, Fort Lauderdale, Florida and thereafter applied for a special use permit for the new property. On October 15, 1986, the Planning and Zoning Board held a hearing with respect to Bannum's application. As a condition for issuing the special use permit, the Planning and Zoning Board informed Bannum that the police department desired the names and/or status of the ex-offenders in Bannum's CTC. Bannum informed the Planning an Zoning Board that the BOP would not authorize a list of the ex-offenders to be disclosed to the police department and refused to disclose the information. As a result, the Planning and Zoning Board recommended the denial of Bannum's application for a special use permit.

Shortly thereafter, Bannum then submitted a revised application for a special use permit. In response, the City Commission sent Bannum a letter dated October 24, 1986 which stated, in part:

[A]s a general proposition, the City Commission has expressed the opinion that the City has accommodated a disproportionate share of social service facilities, compared to other cities and areas in Broward County . . .

Apart from that general consideration, my primary concern is the extent to which client referral information may be disclosed to the Police Department . . . This letter will serve to reiterate my request to you to provide me copies of cases, statutes, other laws or regulations which prohibit disclosure, or which protect any one or more particular civil or legal rights of clients involved, especially those involved with control substances, I believe the City would wish to have the right to reject a client proposed for referral, based upon legitimate concerns for community safety. The same concern holds true for those clients who have been diagnosed as psychotics or have been deinstitutionalized from a mental health facility.

The contract between the BOP and Bannum was terminated on November 22, 1986. The BOP's basis for termination was "Bannum's inability to produce documentation of an approved facility which complies with all local zoning and use ordinances, as required under the terms of the contract" and the City's denial of Bannum's application for a special use permit. In the meantime, Bannum-commenced the instant action.

## III. The Relevant Ordinance

Following are the relevant sections of the Fort Lauderdale ordinance at issue. Section 47–11.1 provides:

No building or structure, or part thereof, shall be erected, altered or used, or land or water used, in whole or in part, for other than any use as hereinafter set out:

(a) Any use permitted in R–3–A/RM–25 district.

(b) Foster homes licensed by the State Department of Health and Rehabilitative Services.

(c) Private, elementary or high schools with conventional academical curriculum.

(d) Mobile park homes, subject to the provisions of section 47–11.8.

(e) Convents, fraternity and sorority homes . . .

Section 47–11.1.1 provides:

Whenever application is made for a building permit to erect or enlarge a building, or any land is proposed to be used for:

(a) Homes for the care of the aged, including nursing homes,

(b) Homes or centers for the care, boarding or teaching of children;

(c) Boarding or rooming houses;

(d) Custodial facilities, other than detention facilities, licensed by the State of Florida Department of Health and Rehabilitative Services or other governmental agency having jurisdiction over the facility, such as emergency shelter care facilities, residential child care facilities, adult congregate living facilities, group homes, residential habilitation centers, drug abuse treatment and educational centers, and other similar uses;

No permit shall be issued and no land shall be used for such purpose until the use of such site for such purpose has been approved by resolution of the city commission, after a recommendation by the planning and zoning board. The actions of both the planning and zoning board and the city commission shall be based upon consideration of the following factors:

(1) Impact on the abutting properties from the proposed facility;

(2) The extent to which the proposed facility will serve existing needs within the community;

(3) Compatibility of the proposed facility with existing land uses in the surrounding neighborhood;

(4) Conformance by the proposed facility with all applicable federal, state, and local laws and regulations.

## DISCUSSION

### I. Summary Judgment Standard

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *See Twiss v. Kury,* 25 F.3d 1551 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. However, the non-moving party:

[m]ay not rest upon the mere allegations and denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* at 254–55, 106 S.Ct. at 2513–14.

Additionally, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The fail-

ure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.*

## II. Ripeness

In Defendant's motion for summary judgment, the City argues that Bannum's claim is not ripe for adjudication because the City never made a final decision whether Bannum's use of the Areca Palms constituted a "custodial facility" and whether Bannum could legally operate at the Areca Palms without a special use permit. The City also argues that the matter is not ripe because Bannum never applied for a special use permit for the Areca Palms Motel.

■ In order for an equal protection claim or a substantive due process claim to be ripe for adjudication, the governmental entity charged with implementing the regulations must have reached a final decision regarding the application of the regulations to the property at issue. *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985); *Tari v. Collier County,* 56 F.3d 1533, 1535 (11th Cir.1995);[2] *Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1541 (11th Cir.1991), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). A final decision is said to be made when the *initial* decision maker arrives at a definitive position on the issue that inflicts an actual, concrete injury. *Williamson,* 473 U.S. at 193, 105 S.Ct. at 3120. It is undisputed that, on February 12, 1986, the Board of Adjustment determined that the Areca Palms was being operated as a custodial facility pursuant to Section 47–11.1.1(d) of the Fort Lauderdale Code of Ordinance. While the Court notes that Bannum, through the owner of the

Areca Palms, did not follow through with its appeal of the Board of Adjustment's decision, the decision not to pursue the appeal does not make the matter premature. Certainly a plaintiff cannot assert a substantive due process claim if the authority has not reached a final decision with regard to the application of the regulation to the landowner's property; however, a plaintiff does hot have to exhaust his administrative remedies and appeal the final ruling of the initial decision maker. *See id.* at 193, 105 S.Ct. at 3119; *Tari,* 56 F.3d at 1536. Accordingly, the Court finds that Bannum's claims are ripe for adjudication and turns to Bannum's equal protection claim.

## III. Equal Protection Claim

### A. The Law Governing Equal Protection Claims

■ The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995). Equal protection clause challenges to zoning ordinances, absent allegations that the plaintiff falls into a suspect classification or that fundamental rights are involved, are analyzed under the "rational basis standard."[3] *Cleburne,* 473 U.S. at 439–40, 105 S.Ct. at 3254; *Haves,* 52 F.3d at 921. The rational basis standard requires that classifications made under the challenged ordinance be rationally related to the achievement of some legitimate government purpose. *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *Haves,* 52 F.3d at 921.

---

**2.** In *Tari,* the Eleventh Circuit noted that the Williamson case concerned a due process takings claim rather than a substantive due process claim. Nonetheless, relying on a previous decision of the Eleventh Circuit, *Eide v. Sarasota County,* 908 F.2d 716, 721 (11th Cir.1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991), the court held that a final decision is also required for a substantive due process claim. *Tari,* 56 F.3d at 1535 n. 4.

**3.** "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne,* ·473 U.S. at 440, 105 S.Ct. at 3254 (citations omitted). Certainly when social or economic legislation is involved, the Equal Protection Clause is said to allow states wide latitude. *Id.* (citation omitted).

■ The Eleventh Circuit, relying on several Supreme Court decisions, has enunciated a two-step process in analyzing an ordinance under the rational basis standard. *Haves,* 52 F.3d at 921. The first step requires identification of a legitimate government purpose which the enacting government body could have been pursuing. *Id.* Under the first step, the actual motivations of the enacting governmental body are entirely irrelevant. *Id.* (citing *Beach Communications,* 508 U.S. at 315, 113 S.Ct. at 2102–3; *Panama City Medical Diagnostic, Ltd. v. Williams,* 13 F.3d 1541, 1546 (11th Cir.), *cert. denied,* 513 U.S. 826, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994)). Furthermore, the Equal Protection Clause does not require the enacting governmental body to articulate any reason for its actions. *Id.* at 922 (citing *Beach Communications,* 508 U.S. at 315, 113 S.Ct. at 2102; *Nordlinger v. Hahn,* 505 U.S. 1, 15, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992)). The Equal Protection Clause also does not require any record evidence of a legitimate purpose. *Id.* (citing *Panama City,* 13 F.3d at 1546).

■ The second step of the rational basis standard requires determination of "whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Haves,* 52 F.3d at 922. A rational basis will be said to exist if the reasons for the classification may have been considered to be true and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational. *Nordlinger,* 505 U.S. at 11, 112 S.Ct. at 2332; *Haves,* 52 F.3d at 922. It has been held that "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Beach Communications,* 508 U.S. at 315, 113 S.Ct. at 2102.

4. For an equal protection claim, the Supreme Court has advised the court first to determine whether the ordinance as applied is unconstitutional and, if necessary, then to determine whether the ordinance as written passes constitutional muster. *Cleburne,* 473 U.S. at 447, 105 S.Ct. at 3258. This procedure enables courts to

## B. Bannum's Equal Protection Claim

Bannum argues that the City's requirement that Bannum, operating a CTC, obtain a special use license while other similar and identical uses of property, such as multifamily residences, apartment houses, motels, hotels, foster homes, mobile home parks, convents, and fraternity and sorority houses, were permitted to operate as of right denied Bannum equal protection of the laws. Bannum raises an as applied and as written equal protection challenge.[4]

Bannum argues that *Cleburne* is the controlling authority in the instant matter. Bannum relies on no other cases, except for *Cleburne* and the Eleventh Circuit's decision in this Bannum case, *Bannum, Inc. v. City of Fort Lauderdale,* 901 F.2d 989 (11th Cir. 1990) ("Bannum I"), in its motion for summary judgment.[5]

In *Bannum I,* the Eleventh Circuit directed the district court to analyze Plaintiffs' equal protection and due process claims against *Cleburne;* accordingly. *Bannum I,* 901 F.2d at 999. In *Cleburne,* the City of Cleburne denied an application for a special use permit submitted by Cleburne Living Center, Inc. ("CLC") for the operation of a group home for the mentally retarded. *Cleburne,* 473 U.S. at 435–36, 105 S.Ct. at 3252. CLC subsequently filed suit challenging the City of Cleburne's ordinance as applied and as written. The Supreme Court first determined that the rational basis test was applicable to the *Cleburne* case. *Id.* at 442, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313. The Supreme Court then turned to the issue of whether the ordinance was valid and found that the ordinance was not valid as applied to CLC. In assessing the reasons for the City of Cleburne's application of the ordinance to CTC, the Supreme Court noted:

**[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding,**

avoid making unnecessarily broad constitutional judgments. *Id.*

5. Bannum does rely on *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (5th Cir.1981), *cert denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982).

are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like. It is plain that the electorate as a whole, whether by referendum of otherwise, could not order city action violative of the Equal Protection Clause, *Lucas v. Forty–Fourth General Assembly of Colorado*, 377 U.S. 713, 736, 84 S.Ct. 1459, 1473–1474, 12 L.Ed.2d 632 (1964), and the City may not avoid the strictures of that Clause by deterring to the wishes or objections of some fraction of the body politic. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

473 U.S. at 448, 105 S.Ct. at 3259 (emphasis added).

As stated above, the Eleventh Circuit directed the Court to analyze the instant action against *Cleburne*. However, the Court does not believe that the Eleventh Circuit concluded that the instant action is factually identical or similar to *Cleburne*, thus mandating the same result. Indeed, the Court finds that the facts supporting the equal protection claims in the instant action and in *Cleburne* are different.

Defendant, on the other hand, asks the Court to consider *Bannum v. City of St. Charles, Mo.*, 2 F.3d 267, 272 (8th Cir.1993), a case involving the same plaintiffs with seemingly similar facts. In *City of St. Charles*, Bannum challenged the City of St. Charles' ordinance requiring Bannum to apply for a conditional use license to operate its community treatment center (CTC) on the basis that the ordinance violated the equal protection clause. The ordinance in question, prior to its amendment, prohibited any use which was not expressly authorized in the ordinance. *Id.* at 269. The ordinance also authorized conditional uses if approved by the board of adjustment. *Id.* CTCs were not expressly authorized in the City's zoning ordinances as either a permitted use or a conditional use. *Id.* At a public hearing, it became evident that the City would not grant Bannum a conditional license. Shortly thereafter, the City amended its ordinance by adding half-way houses on its list of conditional uses. Bannum did not apply for a conditional permit to operate its CTC. *Id.*

The Eighth Circuit addressed Bannum's equal protection claim in two parts: (1) whether the City's failure to include CTCs or half-way houses in the original ordinance violated Bannum's equal protection rights; and (2) whether the City's amendment to the ordinance to include half-way houses as a conditional use violated Bannum's equal protection rights. The Eighth Circuit first held that the City of St. Charles did not violate Bannum's equal protection rights by failing to include CTCs or half way houses on its list of conditional uses. The Eighth Circuit stated, "The City could not conceive of and address every possible land use; listing permitted uses and addressing new proposed uses one step at a time is appropriate.... We also cannot say that the City's failure to include CTC's in the original ordinance was arbitrary or irrational; many possible land uses are not listed in the ordinances." *Id.* at 270.

The Eighth Circuit also held that the ordinance, as amended, did not violate Bannum's equal protection rights. *Id.* at 271–72. In so holding, the court noted, "[i]f half-way houses were allowed as permitted uses, the City would have no control over where within a given district a half-way house was located.... Because of legitimate concerns for public welfare, the City could rationally want to control where within a district a half-way house could be located. It can accomplish this legitimate purpose by requiring a conditional permit for operation of a half-way house." *Id.* at 272. In this section of its analysis, the Court also examined the *Cleburne* and the *Bannum I* decisions. While the Eighth Circuit concluded that *Cleburne* was inapposite to its case, it agreed with the Eleventh Circuit that Cleburne was applicable in *Bannum I*. *Id.* at 272 n. 9. The *St. Charles* court noted that, in *Bannum I*, Bannum had an "established track record" in that it was operating its CTC for almost one year before the City denied Bannum a permit to operate. Accordingly, in *Bannum I*, Bannum could challenge the City's decision to deny a permit and could rely on the *Cleburne* holding that mere negative atti-

tudes or fear, would not be a justifiable basis for denial of the permit. *Id.*

■ Although the Court generally agrees with the distinctions made by the *St. Charles* court, the Court notes that Bannum affirmatively chose not to apply for such a license before it commenced operations of its CTC. Therefore, this Court does not consider the fact that Bannum operated for one year as relevant to its equal protection analysis. Rather, turning to the issue of whether the City's denial of a special use license after Bannum applied for said license was impermissible, the Court finds that the City's denial of a special use permit to Bannum was not based solely on negative attitudes or fear. To the contrary, the Court finds that the City's stated concerns were rationally related, as applied and as written, to its land use decisions.

In the instant matter, the City set forth two reasons for its decision to deny Bannum's application for a special use permit: safety concerns and the fact that the City had accommodated a disproportionate number of social services programs. Under the rational basis test, "the legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Indeed, as the Eleventh Circuit in *Corn v. City of Lauderdale Lakes,* 997 F.2d 1369, 1389 (11th Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994), indicated, courts have upheld as valid many reasons for a governmental entity's land use restrictions. For example, the *Corn* court noted that use restrictions may be imposed to protect family values, youth values, the blessings of quiet seclusion or from the ill effects of urbanization, regulations may consider effect on traffic, noise, aesthetic, finances, property value, demand for city services, or other aspects of the general welfare. The Court cannot say that the City's land use decision is merely a pretext for illegitimate motive. Accordingly, the Court grants the City's motion for summary judgment and denies Bannum's cross-motion for summary judgment on Bannum's equal protection claim.

## IV. Substantive Due Process

### A. The Law Governing Substantive Due Process Claims

■ There are two components to the Due Process Clause of the Fourteenth Amendment, procedural and substantive, and a violation of either component may form the basis for a § 1983 suit. *McKinney v. Pate,* 20 F.3d 1550, 1555 (11th Cir.1994), *cert. denied, McKinney v. Osceola County Bd. Of County Com'rs,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). The substantive component of the Due Process clause ensures against "certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). The substantive due process clause protects "fundamental" rights, *i.e.,* rights that are "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)).

The Supreme Court has been hesitant to address the limits of a substantive due process claim and has recognized on more than one occasion, "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered [sic] area are scarce and open-ended." *Collins,* 503 U.S. at 125, 112 S.Ct. at 1068; *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225–226, 106 S.Ct., 507, 513–514, 88 L.Ed.2d 523 (1985). For instance, the Supreme Court has not extended substantive due process protection to rights created by state law, such as tort law and employment law. *Ewing,* 474 U.S. at 229, 106 S.Ct. at 515.

In *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994)(en banc), *cert, denied, McKinney v. Osceola County Bd. Of County Com'rs,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), the Eleventh Circuit addressed the limits of a substantive due process claim created by state law. In overturning prior Eleventh Circuit law, the *McKinney* court

held that "areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution." *Id.* at 1556 (quoting *Ewing,* 474 U.S. at 229, 106 S.Ct. at 515 (Powell, J., concurring)). The *McKinney* court, however, noted that its holding foreclosing substantive due process claims applied only to "executive" or "non-legislative" acts.[6] *Id.* at 1557, 1560. Therefore, acts which are legislative in nature may come under substantive due process challenges.

■ In a substantive due process claim (also termed an "arbitrary and capricious due process claim"), "a plaintiff claims that the application of a zoning regulation to his property is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals or general welfare, and is therefore an invalid exercise of the police power." *Tari v. Collier County,* 56 F.3d 1533, 1535 (11th Cir.1995)(citing *Eide,* 908 F.2d at 721). A substantive due process challenge to a zoning decision is analyzed under the rational basis test and the same test as that applied in an equal protection analysis is utilized. *Restigouche, Inc. v. Town of Jupiter,* 59 F.3d 1208, 1214 (11th Cir.1995). Under the rational basis test, a zoning decision will be upheld if it can be shown that it has a rational relationship with a legitimate general welfare concern. *Id.* (citing *Corn,* 997 F.2d at 1388).

### B. Bannum's Substantive Due Process Claim

■ Since Bannum challenges a legislative act, it has a cognizable substantive due process claim. Bannum argues that the City's reasons for denying it a special use permit to operate its CTC was arbitrary and capricious. Insofar as Bannum's due process claim requires application of the same test as that for an equal protection claim and the same facts are involved, the Court does not find it necessary to repeat its analysis. Indeed, the Court finds that the City's stated reasons for its decision to deny Bannum a special use license passes constitutional muster.

### CONCLUSION

Accordingly, based on the foregoing, it is ORDERED AND ADJUDGED as follows:

1. Defendant's motion for final summary judgment is GRANTED.

2. Plaintiffs' cross-motion for summary judgment is DENIED.

3. All pending motions not otherwise ruled on are DENIED as moot.

---

6. The *McKinney* court defined an executive act as one which applies to a limited number of persons and typically arises from ministerial or administrative activities of members of the executive branch. *Id.* at 1557 n. 9. A legislative act, on the other hand, generally applies to a larger segment of society and includes laws and broad-ranging executive regulations. *Id.*