COLLINS & COMPANY, INC., a Florida corporation; Stokes Collins, Inc., a Florida corporation; and Plum Tree Developers, Inc., a Florida corporation, Plaintiffs,

v.

The CITY OF JACKSONVILLE, a municipal corporation, Defendant.

No. 96–1017–CIV–J–21–C.

United States District Court, M.D. Florida, Jacksonville Division.

May 8, 1998.

Kurt Hughes Dunkle, Theodore Ronald Hainline, Jr., Rogers, Towers, Bailey, Jones & Gay, Jacksonville, FL, for Collins & Company, Inc., Stokes Collins, Inc., Plum Tree Developers, Inc., plaintiffs.

Bruce Dean Page, Sr., General Counsel's Office, Jacksonville, FL, for City of Jacksonville, defendant.

## ORDER

NIMMONS, District Judge.

This cause comes before the Court on Defendant's Motion to Dismiss (Dkt.5) and Plaintiffs' Response (Dkt.6) in opposition thereto. Also filed herein is Plaintiffs' Notice of Supplemental Authority (Dkt.25).

## I. Motion to Dismiss Standard

It is well established that "a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim." *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir.1971); *accord Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In evaluating the sufficiency of a complaint for purposes of a motion to dismiss, the allegations of the complaint must be accepted as true, *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and viewed in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## II. Factual Background

This is a suit by Plaintiffs Collins & Company, Inc. ("Collins"), Stokes Collins, Inc. ("Stokes Collins"), and Plum Tree Developers, Inc. ("Plum Tree"), against the City of Jacksonville ("City") asserting a claim(s) under 42 U.S.C. § 1983 for alleged injury to Plaintiffs' right to develop and/or sell particular real property and injury to Plaintiffs' business reputation, including goodwill. The injuries alleged by the Plaintiffs are claimed to arise from the actions of the City of Jacksonville Environmental Protection Board ("EPB"), an entity of the City government created pursuant to the City Code. *See* Jacksonville, Fl., Code § 73.101(a). The following allegations from Plaintiffs' Complaint (Dkt.1) are, as noted above, taken as true for purposes of considering Defendant's motions to dismiss.

Beginning in approximately 1986, Collins and Stokes Collins conceived of a residential development called Plum Tree ("the development"), located on Old Middleburg Road in Jacksonville; by late 1986 Stokes Collins had obtained from the City site plan approval for the development pursuant to the City Code. From 1986–87, Stokes Collins purchased the land for the first phase of the development, subdivided the land into approximately 100 single family lots, and constructed and sold homes on a majority of those lots. In late 1992, Collins purchased the land for the remaining phases of the development and thereafter conducted various surveys, studies, and tests thereon in connection with applying for permits to develop said land. In June of 1994, Collins assigned the right to purchase the next phase of the development to Plum Tree, which subsequently exercised that right and purchased the land. Thereafter, Plum Tree and/or Collins undertook various actions to further develop the land.

Beginning in February 1996, the Duval County School Board ("School Board") began to search for a site for a new elementary school. As part of those efforts, the

School Board contacted Collins and offered to purchase roughly twenty acres of the development for that purpose. From then until late May of 1996, communications and negotiations continued between the School Board and Collins regarding the possible sale of the land for the school site.

On May 13, 1996, the EPB held a regularly scheduled meeting. Near the end of that meeting, Leslie Dillingham ("Dillingham"), a member of the EPB, moved that the Board send a letter to the School Board expressing the EPB's concerns about the School Board's purchase of a school site within the Plaintiffs' development. In support of her motion, Dillingham allegedly falsely stated the location of the proposed school site and its proximity to the Hipps Road ("Hipps Road") landfill, a former landfill contaminated with hazardous wastes; falsely implied that the hazardous wastes and environmental remediation activities at Hipps Road would pose health risks to people at the proposed school site; and stated that the School Board should not purchase the proposed site from Plaintiffs and should consider other sites.

Plaintiffs allege that no evidence of any health or contamination risk was presented at the May 13th EPB meeting. Further, Plaintiffs allege that the issue of the school site was not on the EPB's agenda for the May 13th meeting and that no other notice was given, to either the public or specifically to Plaintiffs, that the proposed school site would be discussed at that meeting.

By letter of May 14, 1996, (Dkt.1, Ex. 4), the EPB urged the School Board "to reconsider building a school at this proposed site due to the prospect of exposing children, parents, and staff to contamination, including carcinogenic agents." According to Plaintiffs, this letter received wide media coverage, including several articles which appeared in The Florida Times–Union, a local newspaper.

By letter of May 24, 1996, (Dkt.1, Ex. 5) the School Board responded to the EPB's May 14th letter, requesting from the EPB, pursuant to ch. 119, Fla. Stats., "records in your possession dealing with the Hipps Road Landfill Superfund Site ... [specifically all reports, data, or other] information of any kind involving findings of vinyl chloride, benzene, or any other known carcinogenic or toxic agents which specifically are alleged to contaminate the parcel of land in question." By letter of the same date (Dkt.1, Ex. 6), the EPB replied to the School Board's request, stating that there were no such files on record with the EPB, but directing the School Board to certain other records and information in the possession of other entities.

On May 29, 1996, Dillingham and another member of the EPB, along with certain EPB staff, allegedly met with the School Board representatives. At that meeting, Dillingham allegedly again urged the School Board not to purchase the proposed site due to its proximity to Hipps Road and the attendant contamination and/or health risks. Dillingham allegedly also noted to the School Board the availability of other sites for the new elementary school.

On May 31, 1996, McGlade Holloway, the School Board's Assistant Superintendent for Facilities, wrote a memo to Larry Zenke, then Superintendent of Schools. The memorandum (Dkt.1, Ex. 7) stated:

> Concerns have been raised about possible long term effects of locating an elementary school three-quarters of a mile from the Hipps Road Superfund site. No hard, scientific data has been received which would verify that the hazard extends this far from the Superfund site; however, any perception that the school might be unhealthy must be avoided. I recommend that other sites be evaluated for a possible school location.

On that same day, a representative of the School Board orally notified Collins that the School Board had decided not to purchase the proposed school site. The School Board confirmed this decision by letter of June 3, 1996 (Dkt.1, Ex. 8).

Subsequently, Collins conducted various environmental evaluations of the proposed school site, including the testing of the soil and surface and ground waters. According to Plaintiffs, these studies concluded that the proposed school site was not contaminated and that the Hipps Road site posed no environmental threat to the school site. Thereafter, by various letters and at a subsequent meeting of the EPB, Collins requested that the EPB withdraw its May 14th letter to the School Board. Each of Collins' requests was denied.

Plaintiffs then initiated the instant suit pursuant to 42 U.S.C. § 1983, asserting that the actions of the EPB deprived them of due process of law, as guaranteed by the Fourteenth Amendment to the U.S. Constitution. According to the Complaint, the relevant actions of the EPB include, but are not limited to, its approval of Board Member Dillingham's motion at the May 13th meeting; its May 14th letter to the School Board; and its May 29th meeting with the School Board. As to the property interests allegedly injured by the actions of the EPB, Plaintiffs' Complaint identifies two types: real and reputational. The real property rights identified are Collins, Stokes–Collins, and Plum Tree's interests in property in the vicinity of the school,[1] as well as Collins' interest in the school site. Plaintiffs assert that the actions of the EPB damaged or destroyed their ability to develop and/or sell said land. The reputational rights identified are Plaintiffs' business reputations, including goodwill. Plaintiffs assert that the injury to their business reputation has

caused tangible harm to their business interests.

## III. DISCUSSION

### A. General

Section One of the Fourteenth Amendment to the U.S. Constitution provides, in pertinent part, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." Modern constitutional jurisprudence, as enunciated by the U.S. Supreme Court, recognizes two types of protection provided by the due process clause: procedural and substantive. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir.1994) (citations omitted). The procedural component ensures that, when a State seeks to deprive a person of life, liberty, or property, the State follows an appropriate procedure, *see Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); that is, the procedural component of due process grants no substantive rights, but merely protects rights which exist otherwise generally under State law. By contrast, the substantive component of due process contains substantive protection for all fundamental rights comprised within the term "liberty," guaranteeing their protection by the U.S. Constitution from invasion by the States. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674(1992).

The procedural component of due process protects rights that find their basis in state-law from being infringed upon by the State without the provision of appropriate procedural safeguards. While the sub-

1. The Court is dubious of Collins, Stokes–Collins, and Plum Tree's standing to bring a due process claim as to any real property interest in property in the vicinity of the proposed school site. The Complaint would appear to reflect that only Collins had any interest in the proposed school site at the time of the alleged actions of the EPB. Thus, it would appear that, as far as real property interests are concerned, only Collins, if anyone, could have been injured in a legally cognizable way by the alleged actions of the EPB. That is, the Court doubts that Plaintiffs, to the extent that

they allege an injury to their real property interests in property in the vicinity of the school site, would be able to show that they suffered an actual injury so as to have standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (defining elements of standing to include, inter alia, an actual injury to a legally-protected interest). However, as the Court has otherwise concluded that none of the Plaintiffs' claims are cognizable under the due process clause, the Court need not address the issue of standing.

stantive component of due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them,'" *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) (citing *Collins v. Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), the procedural component of due process only ensures that, to the extent a State seeks to alter or even extinguish a right which it recognizes, the State provides a minimum amount of process, *see McKinney,* 20 F.3d at 1556–57. The actual amount of process due, however, is a question of federal law, determined by reference to the analysis set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■ The fundamental rights protected by the substantive component of the due process clause include most—but not all—of the rights specifically enumerated in the Bill of Rights, as well as the various rights implied from the Fourteenth Amendment, *Casey,* 505 U.S. at 849, 112 S.Ct. 2791; however, in all cases, fundamental rights "are created only by the Constitution." *McKinney,* 20 F.3d at 1556 (citing *Ewing,*) (Powell, J., concurring). Although the Supreme Court has stated that neither the Bill of Rights nor the specific practices of the States at the time of adoption of the Fourteenth Amendment mark the outer limit of substantive due process, and has described the process of elucidating the rights protected by substantive due process as being incapable of expression as a simple rule, *Casey,* 505 U.S. at 848–49, 112 S.Ct. 2791, the Court "ha[s] always been reluctant to expand the concept of substantive due process" and "exercise[d] the utmost care whenever asked to break new ground in this field," *Glucksberg,* 117 S.Ct at 2267–68 (citations omitted). Because fundamental rights are deemed to be "implicit in our concept of ordered liberty," the Constitution will suffer little infringement upon them. As a result, Government action affecting fundamental rights must do so in the narrowest way possible and in

furtherance of a State interest that is of a very high order.

**B. Substantive Due Process**

■ As an initial premise, the Court agrees with Defendant that, under the scheme of *McKinney v. Pate,* Plaintiffs are precluded from maintaining a substantive due process claim because the government action of which they complain is executive in nature, rather than legislative. *See McKinney,* 20 F.3d at 1557 n. 9 (distinguishing due process claims which challenge non-legislative (or executive) acts, i.e., those acts applying to a limited number of persons, from those claims which challenge legislative acts, i.e., those acts applying to a larger segment, if not all, of society; implying that only the latter can support substantive due process claims).

■ However, the Court perceives another, more basic flaw in Plaintiffs' substantive due process claims: the lack of a fundamental constitutional right. As Plaintiffs' Response presents various authority to the contrary of this proposition in an attempt to distinguish *McKinney,* at least as regards their real property rights, *see* Dkt. 6 at 1–4 (arguing that *McKinney* dealt with rights based on State law and that the instant case involves a fundamental constitutional right), the sub-issue of whether Plaintiffs possess a fundamental constitutional right merits further discussion.

*(1) Plaintiffs' Real Property Rights*

As support for their argument that the right to own, alienate, or otherwise use real property is a fundamental right within the protection of substantive due process, Plaintiffs cite two cases: *Moore v. City of Tallahassee,* 928 F.Supp. 1140 (N.D.Fla. 1995), and *Wohl v. City of Hollywood,* 915 F.Supp. 339 (S.D.Fla.1995). However, neither of these cases is binding precedent; additionally, both are unpersuasive because they can be distinguished.

The *Moore* Court, in analyzing a plaintiffs substantive due process claim based on the defendant-city's zoning decision (i.e., decision to deny plaintiff an exemption from its comprehensive land use plan), stated that the "right of Plaintiffs to develop and/or sell the Land" is "a constitutionally protected interest . . ., a fundamental American freedom." 928 F.Supp. at 1145 (citing *Washington v. Roberge*, 278 U.S. 116, 121, 49 S.Ct. 50, 73 L.Ed. 210 (1928)). *Roberge* does not extend so far it merely holds that the right to utilize real property for legitimate purposes is "property" within the protection of the Constitution and does not distinguish between the substantive and procedural components of due process. Additionally, *Roberge* predates modern Supreme Court due process jurisprudence. Further, both *Roberge* and *Moore* are zoning cases— cases in which the court is called upon to determine whether the local government decision to grant or withhold permission to utilize land in a particular way was exercised free from arbitrariness and caprice. Such cases rely upon a distinct, discrete body of case law in recognizing a substantive due process right in such a context. *See, e.g., Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1540 (11th Cir. 1991) (explaining four causes of action that a party may bring to challenge a local government zoning decision, including "arbitrary and capricious due process claim" which challenges whether government action is a valid exercise of police power).[2] As with *Roberge*, it is not clear whether such cases survive modern Supreme Court and Circuit due process jurisprudence.

Lastly, there is the *Wohl* opinion cited by Plaintiffs. *Wohl* is another in which the Court reviewed government action to determine whether it was arbitrary and capricious or whether it bore a rational relationship to the public health, safety, morals, or general welfare. *See Wohl*, 915 F.Supp. at 344–45. Most notably, such

analysis was done as an alternative holding, out of "an abundance of caution," as the *Wohl* Court had already concluded that *McKinney* barred any substantive due process claim. *Id.* at 343.

The Court's research into this area has uncovered no authority which directly supports Plaintiffs' position in the instant case; only authority of the type discussed above. *See, e.g., DeBlasio v. Zoning Board of Adjustment*, 53 F.3d 592, 600–01 (3d Cir.1995) (stating, in context of action challenging decision of zoning board as arbitrary or irrationally rendered, that "ownership [of real property] is a property interest worthy of substantive due process protection."). Rather, the Court believes that recent Supreme Court precedent undercuts Plaintiffs' position.

In *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Supreme Court examined, pursuant to a due process challenge, the government's seizure of real property under the civil forfeiture drug laws. In particular, the Court focused on whether the government could seize the property before and without providing a hearing to the property owners. *Id.* at 46–48, 114 S.Ct. 492. Most notably, for purposes of this discussion, the Supreme Court examined that issue only under *Mathews v. Eldridge*, the framework for analyzing procedural due process claims. *Id.* at 53–58, 114 S.Ct. 492. The Court did not undertake a substantive due process analysis, as it surely would have done had the right at issue been fundamental. *Cf. generally Casey*, 505 U.S. at 869–901, 112 S.Ct. 2791 (undertaking substantive due process analysis of State law regulating abortions, based on precedent establishing limited right to abortion as being within the zone of fundamental privacy rights protected by substantive due process).

---

2. The opinion in *Reserve, Ltd. v. Town of Longboat Key*, 933 F.Supp. 1040, 1046 n. 14 (M.D.Fla.1996) (recognizing viability of arbitrary and capricious due process claim to challenge legislative decision regarding zoning), cited in Plaintiffs' Notice of Supplemental Authority (Dkt.25), is likewise not applicable to the instant case.

Based on *James Daniel Good,* which examined the total extinguishment of real property rights by a State only under a procedural due process analysis, as well as the lack of precedent to the contrary, and mindful of the Supreme Court's express direction that the sphere of rights protected by substantive due process be expanded only with utmost caution, this Court concludes that real property rights are not fundamental rights within the protection of the substantive component of the due process clause. Thus, to the extent that Plaintiffs' Complaint asserts a substantive due process claim based on their real property rights, Defendant's motion to dismiss will be granted.

### (2) *Plaintiffs' Reputational Rights*

■ Similarly, Plaintiffs have not cited any authority that their reputation is a fundamental constitutional right. In fact, in the same way that the *James Daniel Good* decision undercuts Plaintiffs' assertion of a fundamental constitutional real property right, the U.S. Supreme Court's decision in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), forecloses Plaintiffs' argument that reputation is a fundamental constitutional right. *See Paul* (holding that reputation alone was not "liberty" or "property" sufficient to invoke protection of procedural due process and that, to be actionable as a due process violation, defamation by government official must additionally deprive individual of, or significantly alter, some State-created right).

### C. Procedural Due Process

The basic procedural due process analysis is a two-step inquiry. First, the Court determines whether there is a recognized life, liberty, or property interest. As noted above, almost all of these interests, particularly the liberty and property interests, have their source entirely in State law. Second, the Court determines, by application of the *Mathews v. Eldridge* formula, how much process, if any, is due and when (i.e., prior to or after the deprivation) it must be provided. Then, by comparison of the facts presented by the individual case to this standard, the Court determines whether there has been a procedural due process violation.

In the instant case, the parties are in disagreement whether the Plaintiffs' asserted business reputation interests are liberty or property within the meaning of the due process clause. This disagreement results from the U.S. Supreme Court's holding in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that reputation alone was not "liberty" or "property" sufficient to invoke protection of procedural due process and that, to be actionable as a due process violation, defamation by government official must additionally deprive individual of, or significantly alter, some State-created right) and the former Fifth Circuit's decision in *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980).[3] The parties do not seem to expressly disagree whether Plaintiffs' asserted real property rights are liberty or property under the due process clause.

However, since the Court concludes, as explained below, that Plaintiffs were not entitled to, nor was it practicable to give, any pre-deprivation hearing, and that there exist adequate post-deprivation State law remedies by which Plaintiffs may be made substantially whole, the Court need not address the threshold issue of whether Plaintiffs' real and reputational interests constitute "liberty or property" within the terms of the Fourteenth Amendment. For this reason, the Court will not separately discuss Plaintiffs' real and reputational interests, as was done above in part III.B.

■ Before discussing the merits of Plaintiffs' procedural due process claims, it

---

**3.** *Marrero* is, of course, binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11 Cir.1981) (adopting as binding precedent all decisions rendered by the former Fifth Circuit Court of Appeals prior to the close of business on September 30, 1981).

is instructive to review the Supreme Court's decision in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). *Parratt* involved a federal court suit under § 1983 by a State prison inmate who sought to recover the value of mail-order hobby materials lost in the care of prison officials. *Parratt,* 451 U.S. at 529, 101 S.Ct. 1908. The inmate asserted that the negligent loss of the materials constituted a deprivation of property without due process of law, in violation of the Fourteenth Amendment. *Id.* The district court granted summary judgment in favor of the inmate and the court of appeals affirmed; the Supreme Court reversed. *Id.* Before the Supreme Court, it was not contested that the inmate had a property right in his hobby materials; rather, the Court focused on whether and how much process the inmate was entitled to, and when such process had to be provided. *Id.* at 536–44, 101 S.Ct. 1908. In discussing this issue, the Court discussed two lines of cases: those in which the Court had required a hearing prior to any deprivation, *id.* at 537–38, 101 S.Ct. 1908, and those in which the Court had not required any pre-deprivation hearing, *id.* at 538–39, 101 S.Ct. 1908.

More specifically, the Court explained that, in cases in which an individual is deprived of property pursuant to an established State procedure and where it is feasible to provide some process prior to the deprivation, the Court has held that due process requires a hearing prior to effectuation of the deprivation. *Id.* at 537–38, 101 S.Ct. 1908 (discussing, as examples, State statute which authorized notice by publication when bank sought to judicially settle a trust account but knew of whereabouts of trust beneficiaries and also State statute authorizing seizure of driver's license and vehicle registration of uninsured motorists involved in automobile accidents). The Court also recognized that post-deprivation remedies can satisfy due process in some situations, but noted the limited range of such situations: instances in which quick action is necessary to prevent the harm sought to be prevented or

instances in which it is impracticable to provide meaningful pre-deprivation process *and* there is available "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Id.* at 538–40, 101 S.Ct. 1908 (discussing, as examples, right of State to seize unwholesome food and drugs and right of State to seize a bank's assets or to issue rent control orders, without first providing a hearing). The Court clarified that, although "the fundamental requirement of due process is the opportunity to be heard ... 'which must be granted at a meaningful time and in a meaningful manner'," this proposition does not always require the State to provide a hearing prior to the initial deprivation. *Id.* at 540–41, 101 S.Ct. 1908.

In the specific case of the inmate in *Parratt,* the Court held that the justifications previously found sufficient to uphold takings of property without any pre-deprivation process were applicable to a situation, like that of the inmate, involving a tortious loss of property as a result of the random and unauthorized acts of a State employee. *Id.* at 541, 101 S.Ct. 1908. The Court explained that, because the inmate's loss was not the result of an established State procedure, and was a loss of which the State could not predict or otherwise foresee, it was impracticable for the State to provide a meaningful hearing prior to the deprivation. *Id.* Lastly, finding that the State had an established tort claims procedure whereby those who claimed to have suffered a tortious loss at the hands of the State could seek a remedy, the Court concluded that there existed an adequate post-deprivation remedy. *Id.* at 543, 101 S.Ct. 1908.

### (1) *Discussion*

In this case, the very nature of the alleged harm—false statements made unannounced by government officials in an attempt to harm a private business—also belies any assertion that the City would be in a position to provide a pre-deprivation

remedy, for nowhere is it alleged that the City knew that Dillingham or others were going to make the statements alleged to have injured Plaintiffs. *See Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. Although the initial statement (made at the May 13th meeting) was arguably made in a context where the Plaintiffs could have been afforded an opportunity to respond, the very nature of the tort—unknowable and unforeseeable as it was by the City—precludes the conclusion that Plaintiffs were entitled to pre-deprivation process. Further, being allowed to respond would not have negated the allegedly false nature of the statements; i.e., it would not have undone the alleged defamation. In this regard, the challenged actions of the EPB are no different from injury that a City employee might inflict on an individual by causing an automobile accident that injures that individual. *See Parratt,* 451 U.S. at 544, 101 S.Ct. 1908; *but cf. Fetner v. City of Roanoke,* 813 F.2d 1183, 1184–86 (11th Cir.1987) (holding that where police chief was called to City Council meeting by Mayor at 9:30 P.M. at which meeting his work performance and conduct as chief were discussed, but was not notified that the Council had voted to fire him until the next morning, police chief stated procedural due process claim cognizable under § 1983, based on his firing without being given notice of the reasons for his termination and a formal hearing; stating that conscious and deliberate act of City's highest governing board as a whole, whereby it considered issue of chief's employment and terminated that employment pursuant to an established State procedure, coupled with practicability of providing notice and a hearing prior to the termination, violated procedural due process).

Plaintiffs argue that the actions of Dillingham and the EPB were not random and unauthorized, pointing to the fact that the initial statement was made at a duly-convened meeting and was echoed by a majority of the quorum of EPB members present. But this does not change the fact that, as alleged by Plaintiffs, no public or individual notice had been given that the issue of the school site would be discussed and that the allegedly false statements would be made. Nor can Plaintiffs identify any procedure (statute, regulation, or otherwise) whereby the EPB is authorized to "defame" corporations. Review of the provisions of the City Code creating and defining the powers of the EPB, attached as Exhibit 1 to Plaintiffs' Complaint (Dkt.1), would not even seem to indicate that the EPB is expressly authorized to issue letters or make statements of the kind that it allegedly did. The allegedly defamatory actions of the EPB simply cannot be said to have been made pursuant to an established State procedure. Further, it is not conceivable that the City could have known that the alleged statements would be made so as to be in position to provide Plaintiffs a hearing or some other process prior to the publication of the statements.

■ Having determined that no pre-deprivation process could have been provided, it is necessary to determine whether the post-deprivation remedies available under State law are adequate.[4] *See Parratt,* 451 U.S. at 539, 101 S.Ct. 1908 (noting that prior cases recognize that post-deprivation remedies satisfy due process where it is impracticable to provide pre-deprivation process and there exists some meaningful means of post-deprivation redress).

The Court concludes that the post-deprivation remedies provided by Florida law are not inadequate. If the Plaintiffs' claims are viewed as a claim for tortious

---

4. In their Response to Defendant's motion, Plaintiffs assert that Defendant has failed to identify any post-deprivation remedy available to Plaintiffs, much less to analyze the adequacy vel non thereof. Plaintiffs have not, however, cited to the Court any authority which states that Defendant must do so. Nonethe-

less, the Court agrees with Plaintiffs that Defendant would have been well-advised to have done so. But, in the absence of any argument from either party regarding the adequacy of State-law remedies, the Court has undertaken its own research into this issue.

interference with prospective business relation (i.e., to sell land), Florida recognizes and provides a civil remedy. *See Ethan Allen v. Georgetown Manor*, 647 So.2d 812, 814 (Fla.1994) (noting that Florida law recognizes cause of action for tortious interference with a business relationship and that the affected business relationship need not be evidenced by an enforceable contract, but rather must only be one which affords the plaintiff existing or prospective legal or contractual rights); *see also Charles Wallace Co. v. Alternative Copier Concepts, Inc.*, 583 So.2d 396, 397 (Fla. 2d DCA 1991) ("[A]n action for intentional interference with a business relationship or expectancy will lie if the parties' understanding would have been completed if the defendant had not intervened.") (cited in *Ethan Allen*). Or, if Plaintiffs' claims are characterized collectively as a defamation claim (i.e., injury to business reputation), with the diminution in the value of their property rights alleged as special damages attributable to the statements, Florida recognizes and provides a civil remedy. *See Psychiatric Associates v. St. Paul Fire & Marine Ins. Co.*, 647 So.2d 134, 138 (Fla. 1st DCA 1994) (noting that corporation has right of action for slander or defamation, although that right is more limited than that of the individual); *see generally Miami Child's World v. Sunbeam Television Corp.*, 669 So.2d 336 (1996) (defamation action by corporation); *see also* Restatement (Second) of Torts § 561 (1977) (stating that one who publishes defamatory matter concerning a for-profit corporation is subject to liability if the matter tends to prejudice the corporation in the conduct of its business or to deter others from dealing with the corporation). And both of these torts can be maintained against the City, based on the actions of its agents and employ-

ees, pursuant to Florida's statutory waiver of sovereign immunity. *See* § 768.28(1), Fla.Stats. (waiving sovereign immunity of State (and all its agencies and subdivisions) for all torts committed by employees and officers acting within the scope of their employment, to the same extent that private persons face liability therefor).[5]

### (2) *Plaintiffs' Alternative Request*

In their Response, Plaintiffs request that, if the Court finds that no procedural due process claim exists because an adequate State remedy exists, they be allowed leave to amend their Complaint to allege all applicable State remedies. Whereas such leave might be properly granted if there were some other remaining claim over which the Court had subject matter jurisdiction, since there is no other such remaining claim, and as "all applicable State remedies" would only be State-law based claims asserted by Florida corporations against a Florida municipal corporation, the Court can see no basis upon which subject matter jurisdiction could be based. Thus, such leave will be denied.

Further, as to the due process claims originally asserted in Plaintiffs' Complaint, leave to amend will also be denied. While this Court acknowledges the rule announced in *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991) ("Where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice."), the Court believes that the second exception to that rule stated in *Bank* is applicable to the instant case, *see id.* ("[I]f a more carefully drafted complaint could not state a claim under the

---

5. That Plaintiffs cannot recover punitive damages against the City, *see* § 768.28(5), Fla. Stats. (precluding recovery of punitive damages in actions under § 768.28), does not render this State law remedy inadequate, *see Economic Development Corp. v. Stierheim*, 782 F.2d 952, 955–56 (11th Cir.1986). As the *Stierheim* Court noted, this same issue was

raised by the inmate in *Parratt*, (i.e., that the unavailability of punitive damages in the State tort compensation scheme at issue therein rendered it inadequate) and rejected by the Supreme Court. *See Stierheim*, 782 F.2d at 955; *see also Parratt*, 451 U.S. at 543, 101 S.Ct. 1908.

**1348**

standard of *Conley,* dismissal with prejudice is proper.").

Upon consideration thereof, it is hereby **ORDERED:**

1. Defendant's Motion to Dismiss (Dkt.5) is **GRANTED**

2. Plaintiffs' Complaint (Dkt.1) is **DISMISSED.**

3. The Clerk is **DIRECTED** to close this file and terminate any other pending motions as moot.